# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS
*In Admiralty*

| | | |
|---|---|---|
| Hanwin Shipping Limited, | * | |
| | * | |
|     *Plaintiff* | * | |
| | * | |
| v. | * | Civil No. 1:22-cv-11182-RWZ |
| | * | |
| Transatlantica Commodities Pte Ltd., | * | |
| Millenary Shipping LP | * | |
| | * | |
|     *Defendants, in personam* | * | |
| | * | |
| and | * | |
| | * | |
| | * | |
| The Master of the M/V Tac Imola | * | |
| | * | |
|     *Garnishee* | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    \*    \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OF LAW OF HANWIN SHIPPING LIMITED IN SUPPORT OF MOTION FOR RECONSIDERATION OF COUNTERSECURITY ORDER

**TABLE OF CONTENTS**

FACTS ........................................................................................................................... 1
ARGUMENT ................................................................................................................ 6
I.   Standard of Review ........................................................................................... 6
II.  Hanwin's Financial Straits, Causing its Inability to Comply with the
     Countersecurity Award, Justifies Reconsideration Under the Circumstances .... 6
CONCLUSION ........................................................................................................... 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aracruz Trading, Ltd. v. Kolmar Group AG*,
   Nos. 3:13-cv-1651 and 3:13-cv-1651, 2015 U.S. Dist. LEXIS 6581 (D. Conn.
   Jan. 21, 2015) ..................................................................................................................9

*Davis v. Lehane*,
   89 F. Supp. 2d 142 (D. Mass. 2000) ................................................................................6

*Result Shipping Co. v. Ferruzzi Trading USA*,
   56 F.3d 394 (2d Cir. 1995)....................................................................................... *passim*

*Titan Navigation, Inc. v. Timsco, Inc.*,
   808 F.2d 400 (5th Cir. 1987) ........................................................................................8, 9

*York Marine, Inc. v. M/V Intrepid*,
   No. 2:15-cv-184-JDL, 2015 U.S. Dist. LEXIS 108673 (D. Me. Aug. 18, 2015) .............9

**Other Authorities**

Fed. R. Civ. P. 54(b) .........................................................................................................6

Plaintiff Hanwin Shipping Ltd., ("Hanwin") by and through its attorneys, and on the basis of the accompanying declarations of Hanwin directors Yin Ming and Jiang Chunrong, respectfully submit this Motion for Reconsideration of the Court's August 24, 2022 memorandum and order, which ordered that Hanwin post countersecurity in the amount of $988,793.21 in favor of Transatlantica Commodities Pte Ltd. ('Transatlantica"), requesting that the award of countersecurity be vacated or reduced for the reasons set forth herein.

## FACTS

Hanwin respectfully submits the declarations of Hanwin director Yin Ming and former Hanwin director Jiang Chunrong in support of this motion, reflecting Hanwin's present inability to satisfy the order directing countersecurity and providing the Court with further details as to the facts underlying its claim and Hanwin's financial difficulties resulting from the fire aboard the TAC IMOLA and the parties' ensuing dispute. As noted therein:

**The Parties' Underlying Dispute**

Further to Hanwin's verified complaint in this action, the Ming Declaration again sets forth the parties' underlying dispute concerning the fire aboard the m.v. "TAC IMOLA" (the "Vessel") and the negligent cargo operations that led to that fire, which is a liability for Transatlantica's account under the Charterparty agreement between Transatlantica and Hanwin. Specifically, pursuant to a charterparty agreement (the "Charterparty") dated November 3, 2021, made between Transatlantica, as Owner, and Hanwin, as Charterer, Transatlantica agreed to charter the Vessel to Hanwin, and Hanwin agreed to take the Vessel on charter. Ming Decl. ¶ 7 and Ex. YM-1 at pp. 3-47 (Charterparty agreement between Hanwin and Transatlantica).

On around November 24, 2021, pursuant the terms of the Charterparty, the Vessel took on loaded cargoes of plywood and Antboxes in the port of Qing Dao, China, bound for Baltimore,

Maryland. Upon completion of loading, the Vessel departed from Qingdao on 26 November 2021. Ming Decl. ¶ 8; *see also* Ex. YM-1 at p. 48 (stowage diagram).

The parties' dispute arises from a fire on board the Vessel, which happened on December 3, 2021, merely one week from the date of discharge. Subsequent investigation suggested that the fire started because of frictional heating between the Antboxes and the Plywood, which points to issues in stowage, lashing, and securing of the cargo. Ming Decl. ¶ 9.

As a result of the fire, the damaged cargo required special handling to discharge from the Vessel. The Vessel has had to make unscheduled port calls to discharge portions of the damaged cargo, and port terminals have charged significantly more for the special handling to offload the damaged cargo. These additional expenses amount to $4,020,898.44 to date. Ming Decl. ¶ 10.

The Charterparty, at Clause 9 of the fixture recap, provides that "*arbitration if any in London with English law to apply.*" Ming Decl. ¶ 11; *see* Ex. YM-1 at p. 7.

Clause 8 of the Charterparty likewise provides that "*Charterers are to perform all cargo handling (to load, stow, lash, trim, discharge) at their expense under the supervision **and responsibility** of the Captain.*" (Emphasis added). Ming Decl. ¶ 12; *see* Ex. YM-1 at p. 11.

Under English law, Hanwin understands that the addition of "*and responsibility*" rendered Transatlantica, as the disponent Owners of the Vessel under the Charterparty, liable for negligence in the cargo operations. The negligence of cargo operations rendered the Vessel unseaworthy, which is again Transatlantica's liability. *See* Ming Decl. ¶ 13. Transatlantica alleges without support that it should be Hanwin who is responsible for these expenses, notwithstanding the plain terms of Clause 8 of the Charterparty. *See* Ming Decl. ¶ 14.

**Hanwin's Financial Difficulties Arising from the Parties' Dispute**

As noted by Hanwin's director Yin Ming, Hanwin has been placed under serious financial strain as a result of the fire on board the Vessel and the subsequent delays and damages flowing from that event, and Hanwin has no means to pay the Countersecurity into Court due to the losses accumulated, the escalating legal costs, and the amount of security paid into various jurisdictions, due to Transatlantica's conduct. Ming Decl. ¶ 15.

First, Hanwin has suffered more than USD $4 million in damages, which have stemmed from the significant delays in the Vessel's voyage as a result of the fire. *See* Ming Decl. ¶ 16. As noted by Hanwin's Mr. Ming, "[t]he Vessel was originally scheduled to discharge in January 2022, but this was actually only completed in July 2022. Hanwin has sub-chartered the Vessel out on voyage charters and therefore the Vessel generated no income from January 2022 to July 2022." *Id.*

Despite Hanwin's losses, Transatlantica still received significant payments of charter hire under the voyage from Hanwin. Although Hanwin has had a meritorious claim against Transatlantica for its negligence arising from the cargo fire at the outset of the Vessel's voyage, Hanwin had no choice but to continue to pay hire so that Transatlantica would not suspend the service of the Vessel. Ming Decl. ¶ 17. Indeed, as noted by Mr. Ming, "[f]rom January 2022 to July 2022, Hanwin has paid Defendant US$3,209,574.30 being hire for the use of the Vessel, while the Vessel generated no income for Hanwin in this period." *Id.*

Hanwin has also already posted significant amounts of security to secure the release of property arrested by Transatlantica on the basis of its counterclaim. To date, without accounting for the countersecurity, Hanwin has posted $3,232,622.31 in various actions in the United States

and in other jurisdictions, which has caused unprecedented strain on Hanwin's finances. Ming Decl. ¶ 18.

In addition to the more than $3 million in security posted, Hanwin has expended more than $560,000 in attorneys' fees and expenses to date, and more than $440,000 in response to Transatlantica's actions in the United States. *See* Ming Decl. ¶ 19. As noted by Mr. Ming, "[m]ost of the costs of Hanwin's UK lawyers were incurred to deal with the hire dispute with the Defendant and coordinating the various jurisdictions. Even excluding Hanwin's UK Lawyers, the fees in US and Panama alone adds to US$443,245.03." *Id.*

**Hanwin's Financial Resources and Outside Sources of Funding Have Been Depleted**

As of the end of September 2022, Hanwin reports having only $75,785.62 left in its only bank account, having accounted for all operational expenses. Ming Decl. ¶ 21. With respect to Hanwin's present circumstances in light of the fire aboard the TAC IMOLA, Mr. Ming reports as follows:

> Hanwin is a small company with limited resources. It was able to afford to charter and operate around three vessels, with the subject Vessel being one of them. The fact that the Vessel generated no income for half a year has therefore severely undermined Hanwin's revenue stream. Hanwin also owns no real properties or Vessels which can be leveraged for financing.

Ming Decl. ¶ 20.

In an effort to mitigate these financial straits, Hanwin relied on loans from City Expansion Limited ("City Expansion") to sustain its operation, and City Expansion advanced $500,000 under a Loan Agreement with Hanwin between September 5-7, 2022. Ming Decl. ¶ 23. However, as Mr. Ming reports, "that amount is barely sufficient to support Hanwin's operation," and due to the financial strain on City Expansion, it is unable to advance further loans to Hanwin. *Id.*

Mr. Jiang Chunrong, the director of City Expansion, corroborates Mr. Ming's account, reporting that "as a result of a large sum being paid into Courts or escrow accounts as security in respect of Transatlantica's claims, the Plaintiff's liquid capital has decreased drastically." Mr. Chunrong explains that Mr. Ming requested that City Expansion lend $500,000 to Hanwin to support Hanwin's operations. *See* Chunrong Decl. ¶ 8. The loan from City Expansion to Hanwin was documented (*see* Chunrong Decl. ¶ 9 and Ex. JC-1 at p. 8), was advanced in three installments on September 5, 6 and 7, 2022, and was repaid with interest on September 21, 2022. Chunrong Decl. ¶ 9.

City Expansion's loan of $500,000 was the maximum amount City Expansion was able to lend to Hanwin. Chunrong Decl. ¶ 10. And, although City Expansion had around USD $1.2 million in cash and bank balances in early September at the time of its loan to Hanwin, numerous expenses had to be paid to third parties between September 5, 2022 to the present, and City Expansion has only $112,081.32 left in its account. Chunrong Decl. ¶ 10; *see* Ex. JC-1 at p. 91 (reflecting a bank balance for City Expansion of $112,081.32 as of September 29, 2022). As noted in City Expansion's audited report, the business of City Expansion is to provide "transport agency services, [and] trading of iron and steel and financial investment." *See* Chunrong Decl. ¶ 11; Ex. JC-1 at p. 11 (Report of the Board of Director(s), under "Company's current principal activity(ies)"). As a separately organized company, Mr. Chunrong reports that the balance left in City Expansion's account "needs to be reserved for its own operation, and thus this amount cannot be lent to Hanwin," and that the funds in City Expansion's account are reserved for its own operation to pay "ocean freight for the steel cargo to be shipped in the upcoming month." Chunrong Decl. ¶ 11.

Finally, Hanwin's only shareholders (Messrs. Yin Ming, Cao Ming, and Justin Cao Ming) likewise cannot afford and do not have the means to lend money for the countersecurity to be paid. Ming Decl. ¶¶ 24-25. As noted, if the countersecurity award is maintained, Transatlantica's claim will be nearly fully secured by the amounts already paid into the US and Panama courts and escrow account, but Hanwin's claim will be entirely unsecured (and the security paid in this action may be subject to release). Moreover, Hanwin will not have any financial means to defend Transatlantica's claim in the London arbitration. *See* Ming Decl. ¶ 29.

## ARGUMENT

### I. Standard of Review

A federal district court has the discretion to reconsider interlocutory orders and revise or amend them at any time prior to final judgment. *Davis v. Lehane*, 89 F. Supp. 2d 142, 147 (D. Mass. 2000); *see also* Fed. R. Civ. P. 54(b). "When faced with a motion for reconsideration, a district court must balance the need for finality against the duty to render just decisions. . . [and] to accommodate these competing interests, a court should grant a motion for reconsideration of an interlocutory order only when the movant demonstrates (1) an intervening change in the law; (2) the discovery of new evidence not previously available; or (3) a clear error of law in the first order." *Id.*

### II. Hanwin's Financial Straits, Causing its Inability to Comply with the Countersecurity Award, Justifies Reconsideration Under the Circumstances

Hanwin does not contend that there has been an intervening change in the law or any clear error of law in respect of this Court's decision to award countersecurity to Transatlantica, because the final clause of Rule E(7) makes clear that "the trial court possesses broad discretion in deciding whether to order countersecurity . . ." *Result Shipping Co. v. Ferruzzi Trading USA*, 56 F.3d 394, 399 (2d Cir. 1995). Rather, Hanwin respectfully requests the Court's reconsideration of whether

the amount of countersecurity awarded in this case is equitable or appropriate given the evidence supplied by current and former Hanwin personnel that Hanwin is presently unable to post the required countersecurity amount or obtain an outside source of funding, as detailed by Messrs. Ming and Chunrong.[1] In light of that evidence, and because Transatlantica already has received reciprocal protection from Hanwin as against the amount of security it has posted in this case, the Court's Order is not in keeping with the principles that are to guide the decision whether to order countersecurity to be posted and in what amount, and Hanwin respectfully requests that the award of countersecurity be vacated or reduced in light of that evidence.

---

[1] Hanwin and the undersigned regret not submitting this motion earlier in time, due in no small part to the press of litigation matters to which Hanwin has been subjected in connection with this matter. As noted by Mr. Ming in his declaration, "I apologize for the delay in taking out this application. It was originally the intention of Hanwin to attempt to comply with the order of the Court to the best of its abilities. However, as the deadline for payment of the Countersecurity drew near, it became clear that Hanwin was not able to raise additional financial resources to meet the Court's order. As a result, Hanwin took out the application in hopes that the Court can re-consider the amount of Countersecurity." Ming Decl. ¶ 31.

Likewise, Hanwin has been seeking diligently to attend to these matters but has also been simultaneously named as a defendant in no less than eight parallel proceedings in different jurisdictions with competing deadlines and demands, in addition to this proceeding. *See Transatlantica Commodities Pte Ltd. v. Hanwin Shipping Limited et al.*, Case No. 22-cv-1275 (District of Maryland) (filed May 27, 2022); *Transatlantica Commodities Pte Ltd. v. Hanwin Shipping Limited et al.*, Case No. 22-cv-3348 (District of New Jersey) (filed June 1, 2022); *Hawthorne Industrial Products Inc. et al v. M/V Tac Imola et al.*, Case No. 22-cv-1376 (District of Maryland) (filed June 6, 2022); *Transatlantica Commodities Pte Ltd. v. Hanwin Shipping Limited et al.*, Case No. 22-cv-1983 (Southern District of Texas) (filed June 17, 2022); *Transatlantica Commodities Pte Ltd. v. Hanwin Shipping Limited et al.*, Case No. 22-2454 (Eastern District of Louisiana) (filed August 2, 2022); *Hawthorne Industrial Products Inc. v. M/V Indigo Spica (IMO No. 9708758) et al.*, Case No. 22-cv-1946 (District of Maryland) (filed August 5, 2022); *Hawthorne Industrial Products, Inc. v. Hanwin Shipping Limited, et al.*, Case No. 22-cv-2724 (Eastern District of Louisiana) (filed August 18, 2022); *Hawthorne Industrial Products Inc. v. Hanwin Shipping Limited*, Case No. 22-cv-3035 (Southern District of Texas) (filed September 7, 2022).

The Second Circuit in *Result Shipping* explained that the Court's discretion whether to order countersecurity should be guided by "two principles, which sometimes conflict with one another. . ." The Court stated:

> **On the one hand, the purpose of Rule E(7) is to place the parties on an equality as regards security** . . . which usually favors granting countersecurity when a defendant whose property has been attached asserts non-frivolous counterclaims growing out of the same transaction, especially when the counterclaimant could have proceeded *in rem* or *quasi in rem* in an independent suit. **On the other hand, the Rule is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit.** In balancing these policies, the trial court is to be guided by the essential and equitable purposes of the rule. In doing so, **the court must weigh the importance of the security interest giving rise to the initial seizure, and the burden of posting countersecurity, against the potential injustice of requiring the defendant-counterclaimant to post security without affording reciprocal protection.**

*Result Shipping Co.*, 56 F.3d at 399 (citing *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987) (noting that although not all courts are uniform, "when a party is financially unable to post countersecurity, courts often dispense with the requirement of the rule") (emphasis added).

The Fifth Circuit explained in *Titan Navigation*, that "[t]he leading case on this point . . . remains *The Beaumont*, 8 F.2d 599 (4th Cir. 1925)" in which the Fourth Circuit stated in relevant part:

> The rule never contemplated, . . . that, where the parties to the original libel had established their rights and obtained security, this should be lost to them, because of their inability, arising from insolvency or other good reason, to procure a bond to respond to a large claim asserted in the cross-libel, and that as a result their libel should be dismissed.

*Titan*, 808 F.2d 400 at 403 (citing *The Beaumont* and collecting other examples where countersecurity was not warranted). This means that a claimant with a security award should not

lose its security or its ability to prosecute its claim, merely by virtue of its financial inability to provide countersecurity to respond to a large counterclaim asserted in response to its initial claim. *See id.* Nor should a countersecurity award issue if the proposed defendant-counterclaimant (here – Transatlantica) already has reciprocal protection in respect of the security award it posted in Massachusetts. That is because Hanwin has already secured more than USD $3 million of Transatlantica's "counterclaim" – which has not even been supported by any factual declarations from the underlying client but only by a statement of counsel – whereas Transatlantica has only been made subject to two security awards -- $564,000 in this case and $400,000 in a countersecurity award issued against Transatlantica in Louisiana.[2]

---

[2] The circumstances in *Aracruz Trading, Ltd. v. Kolmar Group AG*, Nos. 3:13-cv-1651 and 3:13-cv-1651, 2015 U.S. Dist. LEXIS 6581 (D. Conn. Jan. 21, 2015) are not to the contrary, because in *Aracruz*, the counterclaimant Kolmar – the charterer – was in the same position as Hanwin, and had been made subject to claims from the shipowners in that case in connection with London arbitration, but had not received any security on its alleged counterclaim. Here, Transatlantica has already received over $3.2 million from Hanwin in security on its claims in different jurisdictions, which afford it more than reciprocal protection against the amount that it was ordered to post (some $564,000) in this action. *See* Dkt. 26 (allowing release of attachment upon security to be posted in the amount of $564,283.35). As per *Result Shipping*, this reflects that the financial burden placed on Hanwin to post an additional $988,793.21—which could jeopardize its continued defense in London arbitration and its continued prosecution of this action—should outweigh the "potential injustice of requiring [Transatlantica] to post security without affording reciprocal protection." 56 F.3d at 399-400. There is no injustice in foregoing an award of countersecurity to Transatlantica under the particular circumstances presented here. Nor should Hanwin's inability to post countersecurity mean that it should be unable to pursue its own claim against Transatlantica or lose the security originally posted, which is a fraction of Hanwin's own claim. *See Titan*, 808 F.2d 400 at 403 (citing *The Beaumont*); *see also York Marine, Inc. v. M/V Intrepid*, No. 2:15-cv-184-JDL, 2015 U.S. Dist. LEXIS 108673, at *7 (D. Me. Aug. 18, 2015) (finding that an award of countersecurity was not warranted where it would be likely to preclude Plaintiff from pursuing its claim, noting that the "purpose of Rule E(7) is to place the parties on equal footing regarding security, not to inhibit the plaintiff's prosecution of its suit as a maritime lien holder.") (internal quotations omitted).

Here, both principles that guide the decision whether to order countersecurity counsel against the award of countersecurity in Transatlantica's favor in this case.

First, the award of countersecurity in this case did not serve to "place the parties on an equality as regards security" because Transatlantica had already received far more in security with respect to its claims than Hanwin had received with respect to its counterclaims. Nor did the Court's order cease Transatlantica's attempt to secure even more funds in litigation from Hanwin. Specifically:

- In Louisiana – unlike in this case – Hanwin was ordered to post $400,000 in security, and Transatlantica was ordered to post an equivalent amount of $400,000 in countersecurity on the same claims (but not the full amount of Hanwin's $4 million counterclaim). *See* Dkt. 27 in *Transatlantica Commodities Pte Ltd. v. Hanwin Shipping Limited et al.*, Case No. 22-cv-2454 (E.D. Louisiana) (August 9, 2022) (order approving Hanwin's special bond of $400,000 in favor of Transatlantica, and ordering that "Transatlantica must forthwith provide Hanwin with counter-security in the amount USD 400,000.").

- In Texas, Transatlantica has attached funds held by Hanwin's port agent in the amount of $979,893.63. But as the parties are litigating the propriety of the initial attachment of those funds, the Court has not yet addressed Hanwin's request for countersecurity.

- In the other proceedings (New Jersey and London arbitration), the parties agreed that Hanwin would make partial payments of security, and Hanwin had not yet pursued countersecurity until it became apparent that Transatlantica has been unwilling to compromise its supposed claims in any respect. Moreover, Transatlantica's claims have also continued to be inflated without explanation.

Specifically, after the Court issued its order in this case, which supposedly provided Transatlantica with full security, one might have thought that Transatlantica would cease its continued efforts to litigate its claims against Hanwin in different jurisdictions, having obtained an order for "full" security on its claims. This did not occur.

Instead, since the date of the Court's order, Hanwin argued in Texas that since Hanwin had already provided $3,232,622.31 to Transatlantica in security, and was also subject to this Court's order to post an additional $988,793.21 in countersecurity, Transatlantica had already received far more in security than it had originally alleged in damages in Texas, and had no basis to continue its action. On June 17, 2022, Transatlantica alleged in Texas in a complaint that its damages were $3,057,786.28 so it had already received security from Hanwin to satisfy that amount. *See* Dkt.1 in *Transatlantica Commodities Pte Ltd. v. Hanwin Shipping Limited*, Case No. 22-cv-1983 (Southern District of Texas).

In response, Transatlantica on September 1, 2022 filed a **new** motion for leave to amend its complaint in Texas asserting that its damages had now increased to $5,397,245.23 and that Transatlantica remains supposedly "under-secured" even accounting for this Court's order that Hanwin should post "full" countersecurity. *See* Dkts. 29, 29-1 in *Transatlantica Commodities Pte Ltd. v. Hanwin Shipping Limited*, Case No. 22-cv-1983 (Southern District of Texas). Notably, this new inflated amount—alleged without explanation by Transatlantica in Texas on September 1, 2022—is also more than $800,000 higher than the amount Transatlantica alleged as damages in its counterclaim in this action just three days earlier. *See* Dkt. 36 (Transatlantica's Answer and Counterclaim to First Amended Complaint) at p. 8 (filed August 28, 2022) (alleging damages of $4,567,272.74). The Court's order has not ceased Transatlantica's push to litigate for even more security from Hanwin.

Second, the Court should reconsider the application of the second principle of *Result Shipping*, that the Rule on countersecurity "is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit," in light of the evidence provided by Hanwin's directors with this motion. As shown by Hanwin's current and former director, approximately an additional million dollars in security under the circumstances presented is financially unsustainable. Hanwin is a small company whose financial resources have been depleted. *See* Ming Decl. ¶ 20. Indeed, over the past several months, Hanwin has paid Transatlantica over $3 million in hire for the TAC IMOLA; deposited over $3 million in security in various actions in the United States and other jurisdictions (the majority of which were brought by Transatlantica in connection with the TAC IMOLA dispute); and expended nearly $600,000 in legal fees to date coordinating these various legal proceedings. *See id*. ¶¶ 17-19. Although Hanwin has taken out loans from City Expansion Limited to stay afloat, those funds are limited and barely sufficient to support Hanwin's continued operations. *See id*. ¶ 23; *see also* Chunrong Decl. ¶ 10. In short, should the Court's countersecurity award be maintained, Hanwin has good reason to fear that it will be unable to prosecute its claims – or defend against Transatlantica's – in this jurisdiction or elsewhere.

## **CONCLUSION**

For the foregoing reasons, Hanwin respectfully requests that the Court reconsider and vacate the award of countersecurity in Transatlantica's favor in this case, or in the alternative reduce the amount awarded.

Respectfully Submitted October 12, 2022

                 */s/ Brian P. Maloney*
                 Brian P. Maloney
                 maloney@sewkis.com
                 Bruce G. Paulsen
                 paulsen@sewkis.com

Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421

-and-

Christopher McNally (BBO # 687998)
cmcnally@boatinglaw.com
Todd D. Lochner
tlochner@boatinglaw.com
Lochner Law Firm, P.C.
91 Main Street, 4th Floor
Annapolis, MD 21401
(443) 716-4400

*Attorneys for Plaintiff Hanwin Shipping Limited*